245 So.2d 485 (1971)
MILLER CAR WASHES, INC., Plaintiff-Appellant,
v.
Larry D. CROWE et al., Defendants-Appellants,
American Employers Insurance Company and Home Insurance Company, Intervenors-Appellants.
No. 11589.
Court of Appeal of Louisiana, Second Circuit.
March 2, 1971.
Rehearing Denied March 30, 1971.
Writ Refused May 24, 1971.
*487 Oliver, Fudickar & Wilson, by Fred Fudickar, Jr., Monroe, for Miller Car Washes, Inc., plaintiff appellant.
Davenport, Files & Kelly, by Thomas W. Davenport, Monroe, for Miller Car Washes, Inc., plaintiff-appellant; American Employers Ins. Co. and Home Ins. Co., intervenors-appellants.
Theus, Grisham, Davis & Leigh, by J. C. Theus, Monroe, for Larry D. Crowe and United States Fidelity and Guaranty Co., defendants-appellees-appellants.
Jones, Blackwell, Chambliss, Hobbs & Henry, by Sam O. Henry, III, West Monroe, for Larry D. Crowe, defendant-appellant.
Warren Hunt, Rayville, for Warren H. Bancroft, individually and d.b.a. Bancroft Butane Gas Co., defendant-third party plaintiff-third party defendant-appellee-appellant.
Hayes, Harkey, Smith & Cascio, by Thomas M. Hayes, Jr., Monroe, for The Travelers Ins. Co. and Warren H. Bancroft, d.b.a. Bancroft Butane Gas Co., defendants-third party plaintiffs-third party defendants-appellees-appellants.
Before AYRES, PRICE, and HALL, JJ.
En Banc. Rehearing Denied March 30, 1971.
AYRES, Judge.
This action for damages by Miller Car Washes, Inc., hereinafter referred to as "Miller," arose out of an explosion of butane gas as the gas escaped from a tank on a pickup truck of Larry D. Crowe, hereinafter referred to as "Crowe," which explosion produced a fire at Miller's place of business on Louisville Avenue in Monroe. This action was consolidated for the purpose of trial with that of Zurich Insurance Company v. Crowe et al., this day decided, 245 So.2d 497.
*488 Miller is the owner and operator of a semiautomatic automobile washing concern where the explosion and fire occurred. Vehicles driven into the establishment were hooked onto an electrically operated conveyor chain and pulled through the building in the process of their being cleaned and washed. In the process, detergents were sprayed on the vehicles as lines of brushes swept the tops and sides. The vehicles were thus cleaned, washed, and rinsed.
On the day of the accident, May 26, 1969, Crowe brought to plaintiff's place of business for cleaning and washing a Chevrolet pickup truck in the bed of which there was mounted immediately behind the cab and crosswise of the bed, a 60-gallon butane tank, approximately two-thirds full. As the truck was pulled, or towed, through the washing process, a hose on the butane tank was detached, allowing the butane to escape. The gas was ignited by fires underneath boilers heating the water used in the cleaning process. The gas exploded producing a fire which spread to the building and contents causing damage thereto and destroying an automobile following the truck in the cleaning and washing assembly-line process.
Miller seeks to recover damages sustained to the building and contents as well as the loss of alleged profits and incidental expenditures. American Employers Insurance Company and Home Insurance Company, hereinafter referred to as "American" and "Home," respectively, insurers of the building and contents, by intervention and as subrogees of plaintiff to the extent of the amount paid plaintiff on its losses, seek reimbursement thereof.
Made defendants in the instant case were (1) Crowe, owner of the truck and the butane tank; (2) United States Fidelity and Guaranty Company, hereinafter referred to as U. S. F. & G., Crowe's liability insurer; (3) Warren H. Bancroft, d. b. a. Bancroft Butane Company, hereinafter referred to as "Bancroft," a retailer of butane and propane gas and equipment; and (4) The Travelers Insurance Company, hereinafter referred to as "Travelers," Bancroft's public liability insurer.
In the companion case Zurich Insurance Company, hereinafter referred to as "Zurich," as subrogee of Alfred D. Gallagher, owner of the automobile destroyed by the explosion and fire, seeks to recover the amount paid Gallagher, under the terms of its insurance contract, for the loss sustained by him. Made defendants by Zurich were Miller, Bancroft, Crowe, Travelers, and U. S. F. & G.
The principal issues relate to charges of primary negligence directed by Miller to Crowe and Bancroft; by Zurich to Miller, Crowe, and Bancroft; and by Crowe, in reconvention, against Miller.
Plaintiff's primary complaint consists of violation by Crowe and Bancroft of the rules and regulations of the Louisiana Liquefied Petroleum Gas Commission, promulgated in accordance with the provisions of LSA-R.S. 40:1846, which rules and regulations require that:
"* * * connections to containers * * * shall be provided with suitable automatic excess flow valves, or in lieu thereof may be fitted with quick-closing internal valves, which, except during delivery operations, shall remain closed,"
and that:
"All valves shall be safeguarded against mechanical injury due to collision, overturning or other emergency."
In this connection plaintiff points out that Bancroft assembled the tank, couplings, connections, and valves which he sold to Crowe, but that he omitted the installation of an automatic excess-flow valve. Specific charges of negligence directed to Crowe and Bancroft are that they violated the rules and regulations of the Commission in that the butane tank on Crowe's truck was not fitted with an excess-flow valve, nor were its valves adequately safeguarded. Other charges directed to Crowe individually *489 were that a flow valve on the tank was in an open position prior to and at the time of the explosion and fire, that Crowe did not empty the tank of its highly inflammable and explosive contents prior to tendering the truck to plaintiff, and that he did not advise plaintiff or its employees of the dangers likely to be encountered in the process of cleaning and washing the vehicle.
Charges of negligence similar to those enumerated above were directed by Zurich to Crowe and Bancroft.
Negligence directed, by defendants and Crowe in reconvention, to Miller consisted in the allowance of a truck containing butane or propane to pass through its automatic car-wash machinery without a check or inspection to determine whether that could be done in safety and without danger to other vehicles. This was characterized as a clear omission of duty, particularly in view of the obvious danger created by the character of the truck and the presence of a butane tank on the truck.
Bancroft and Travelers, in a third-party proceeding against Crowe, U. S. F. & G., American, and Miller, contend that at the time of the accident Miller was a bailee-for-hire or depositary-for-hire of the Crowe pickup truck and butane tank which were held by Miller in its care, control, and custody. It was therefore contended the doctrine of res ipsa loquitur applied and that Miller was thus required to explain the manner in which the accident occurred and to exculpate itself from fault.
In the alternative, it was alleged that Miller was at fault in breaking or disconnecting the hose on the butane tank and in thus allowing the gas to escape, in permitting portions of the washing equipment to come in contact with the tank and its connections, and in failing to exercise due care as the vehicle was towed through the washing process. It was additionally charged Miller failed to issue instructions with reference to precautions to be taken in the washing of a truck on which there was mounted a butane-propane tank with exposed and clearly visible connections, valves, and hoses.
The court, after trial, concluded in a written opinion that Miller was guilty of negligence, at least, contributing to the occurrence of the accident, as was Crowe. Therefore, in the instant case, plaintiff's demands were rejected, as were those of American and Home. The reconventional demands of Crowe and U. S. F. & G. were likewise rejected. This had the effect of rejecting the third-party demands of Crowe and U. S. F. & G. against Bancroft and Travelers and the rejection of the similar demands of the latter against the former.
In the companion case there was judgment for Zurich against Miller, American, Crowe, and U. S. F. & G. Zurich's demands against Bancroft and Travelers were rejected because of a finding that the evidence did not establish that Bancroft omitted the installation of a safety valve on the butane tank sold to Crowe. The third-party demands of Crowe and U. S. F. & G. against Bancroft and Travelers were denied as were the demands of Bancroft and Travelers against Crowe and U. S. F. & G.
All parties except Zurich have appealed. Bancroft and Travelers appealed in both cases from the dismissal of their third-party claims against Crowe and U. S. F. & G.
It appears appropriate that such of the facts established by the record as are deemed pertinent to the issues presented for resolution be briefly reviewed.
Crowe is a farmer with extensive operations. Much of his machinery is fueled with either butane or propane. Replenishment of the machinery's fuel supply, when exhausted in the fields, was made through tanks attached to pickup trucks. These tanks, usually of 60-gallon capacity, mounted athwart the beds of the trucks, were the means whereby the needed gas was transported from large storage tanks maintained by Crowe to the machinery operating in the fields. Each of these small service *490 tanks, when properly equipped, was supplied with an intake valve through which the tank was filled from a storage tank, and a discharge valve through which, by the use of a hose, the equipment was refueled. There was also a safety or pop-off valve for the relief of excessive internal pressure to lessen the danger of rupture of the tank or hose.
About two months prior to the accident, Crowe purchased a new pickup truck, the one involved in the accident. The butane tank was transferred from an older to the newer truck. Bancroft testified that when the tank was remounted he personally installed new fittings; that he personally installed an excess-flow valve, a new liquid discharge valve, a new hose, and a new globe valve. A test, he stated, was then run on the excess-flow valve and the valve was found to be operating properly. This equipment which Bancroft installed was acquired by him in new condition from E. R. Kiper Gas Corporation, a wholesale dealer in butane-propane gas and appliances. Don Kiper of that concern testified that all of these attachments, including the excess-flow valve, were of a type and manufacture recognized and approved in the industry. Bancroft's testimony that he installed and tested the excess-flow valve is uncontradicted. Crowe testified, however, that after the new truck was purchased and the tank installed thereon, he did not personally use the truck to refuel any of his equipment. Several of his employees, however, had the use of it for that purpose and it had been so used.
On the date of the accident Crowe drove the new truck with the butane tank mounted thereon from Oak Grove to Monroe, a distance of about 70 miles, and proceeded to Miller's place of business where, upon arriving, he delivered the truck to Miller's employees with instructions to clean and wash the truck and hold it until his return from a business engagement.
The cleaning process was begun by Miller's employees with the use of hand-operated cleaning and vacuuming equipment. They also removed a 2-way radio aerial and laid it in the bed of the truck. Next, the truck was driven to the back of plaintiff's establishment where hot water from a high-pressure hose was applied to its wheels and underside by an employee named Lavelle Diggins. Diggins operated the high-pressure hot-water hose before and immediately after the first phase of the washing operation. By use of counterweights mounted on a lever, he also operated large overhead rotating brushes filled with innumerable long nylon strands used to clean the tops of vehicles.
The Gallagher automobile was hooked onto the conveyor belt immediately behind the Crowe truck and it was likewise started on its journey. Thus, Diggins had to play the high-pressure hot-water hose on the back of the Crowe truck and on the wheels and the underside of the Gallagher car. It was also his duty to simultaneously manipulate the counterweights on the overhead brushes to prevent their falling into the bed of the pickup truck.
Edward L. Miller, president and manager of plaintiff, Miller Car Washes, Inc., in giving details of the washing operations, testified, with respect to the servicing of a pickup truck, that the brushes for cleaning of the tops of vehicles are held up to prevent their falling into the beds of trucks, to protect not only the contents of the beds of the trucks but also the equipment itself; because, should the brushes hang up on the truck's tailgate, very expensive items of equipment may be destroyed. Another purpose served in not lowering the brushes to a point where they would strike the bottoms of truck beds is to prevent the brushes from picking up objects therefrom. For instance, Miller stated that, after picking up objects from the beds, these brushes could propel them onto following cars or into personnel working near them.
Diggins, standing on the right side of the assembly line, facing forward, and another employee, Andrew Elliott, farther forward on the opposite side of the assembly *491 line, heard a loud hissing noise followed by one or more explosions. Elliott started to run but returned and threw the electric switch, turning off the electricity to all the equipment including the motor-operated conveyor belt. Diggins, having been knocked down and burned, got up and ran from the building. A fire broke out immediately after the explosion. Plaintiff's building and Gallagher's car were destroyed. Crowe's truck was slightly damaged.
After the fire, Assistant Fire Chief Cantrell examined the butane tank in the bed of the pickup truck. The liquid-discharge valve was in an open position. The hose was broken off just below the clamps which held it to the nipple of the discharge valve. The brass fitting which connected the valve fitting on the opposite end of the hose with the top of the tank had snapped off. After the break, the 20-foot hose extended over the right side of the truck bed with a 6-foot segment on the ground. The valve fitting to which an end of the hose had been attached was found broken in the rear end of the bed of the truck.
The morning following the accident Don Kiper was called to the scene by adjusters investigating the fire on behalf of American and Home. Kiper removed the liquid-discharge valve but found no excess-flow valve. The truck with the attached tank was taken to Kiper's place of business where Kiper conducted tests on the tank. His tests disclosed that the tank was intact, with no rupture. The pop-off valve, still in place, was working properly and opened automatically at an interior pressure of 275 pounds per square inch. His testimony and that of Wharton LeBlanc, an expert called on behalf of Bancroft and Travelers, was to the effect that the hose had an internal working pressure of 350 pounds per square inch and a bursting pressure of 1750 pounds per square inch, a pressure higher than the bursting pressure of the steel tank itself. Testimony indicated the pop-off valve would have allowed excess pressure to escape from the tank long before internal pressure could have ruptured either the tank or the hose. Both Cantrell and LeBlanc testified that the hose and the brass filler coupling were broken as a result of external force. Kiper expressed the same opinion.
The consensus of these experts after making the aforesaid examinations and tests was that a combination of three factors was necessary for the gas to escape from the tank in great force: (1) the breaking or tearing loose of the hose by some external force, (2) the open position of the liquid-discharge valve, and (3) the absence of the excess-flow valve.
The established facts present a classical case for invoking the principles of the civil law with respect to the responsibility of a depositary to a depositor or invoking the doctrine of res ipsa loquitur as applied, under the common law, to bailor-bailee relationships. As heretofore noted, the Crowe truck, with its butane tank, and the Gallagher automobile were in the complete and full custody of Miller who was to be paid a fee or charge for its services. During the time these vehicles were in such custody, the gas escaped from the tank, an explosion occurred, followed by a fire, and the damages were done. The depositary or bailee disclaims any knowledge as to how the accident occurred. Neither of the depositors or bailors was present or knew the cause of the accident. Miller does allege, however, that the hose was detached from the butane tank while the truck and the car were in the assembly-line washing process.
The principle and doctrine referred to often find application in depositor-compensated depositary relationships as well as bailor-bailee for hire relationships. For instance, under provisions of LSA-C.C. Art. 2937, it is stated:
"The depositary is bound to use the same diligence in preserving the deposit that he uses in preserving his own property." *492 And, in LSA-C.C. Art. 2938, it is declared:
"The provision in the preceding article is to be rigorously enforced:
* * * * * *
"2. If it has been agreed that he shall have a reward for preserving the deposit.

* * * * * *"
The provisions of these articles are applicable to parking lot operators who accept automobiles for parking for a fee. Neely v. Tamburello, 187 So.2d 526 (La.App., 4th Cir. 1966); Marine Ins. Co. v. Rehm, 177 So. 79 (La.App., Orl.1937writs refused).
The articles are likewise applicable to garage operators who accept automobiles for repair. Baker v. Employers Fire Ins. Co., 201 So.2d 349 (La.App., 2d Cir. 1967); Leigh v. Johnson-Evans Motors, Inc., 75 So.2d 710 (La.App., 2d Cir. 1954).
Service stations are also in the same category. Indiana Lumbermen's Mut. Ins. Co. v. Humble Oil & R. Co., 170 So.2d 264 (La.App., 2d Cir. 1964); Great American Indemnity Co. v. Ford, 122 So.2d 111 (La. App.2d Cir. 1960);
as are used-car lot operators: Meine v. Mossler Auto Exchange, Inc., 10 La.App. 65, 120 So. 533 (La.App., Orl.1929);
and the lessee of an automobile: U-Drive-It v. Ernest, 23 So.2d 665 (La.App., Orl. 1945writs denied);
a hotel which had received mail for a guest: Alex W. Rothschild & Co. v. Lynch, 157 La. 849, 103 So. 188 (1925);
an airline which had accepted freight for shipment: Mirandona v. Aaxico Airlines, Inc., 143 So.2d 805 (La.App., 4th Cir. 1962);
an appliance dealer who kept appliances of a customer in storage until the customer was ready to put them in use: Olinde Hardware & Supply Co. v. Ramsey, 98 So. 2d 835 (La.App., 1st Cir. 1957);
laundry and cleaning establishments: Bond v. Helmer, 215 So.2d 355 (La.App., 4th Cir. 1968); Holder v. Lockwood, 92 So. 2d 768 (La.App., 2d Cir. 1957); Jeter v. Lachle, 106 So.2d 808 (La.App., 2d Cir. 1958);
a wrecker service: White v. Pitts, 111 So. 2d 808 (La.App., 2d Cir. 1959);
motorboat repairmen: Home Ins. Co. v. Southern Specialty Sales Co., 225 So.2d 776 (La.App., 4th Cir. 1969); Rancatore v. Evans, 182 So.2d 102 (La.App., 4th Cir. 1966); Lumbermens Mutual Casualty Co. v. Wallace, 138 So.2d 247 (La.App., 4th Cir. 1962writs denied); and a house mover: Southern Farm Bureau Casualty Ins. Co. v. Florane, 173 So.2d 545 (La.App., 3d Cir. 1965).
This relationship is closely akin to those mentioned above wherein the courts applied the law relative to a compensated deposit or a hiring. Thus, we can perceive of no reason why the operator of an automobile car-washing business should not be in the same category.
Under the relationships and situations presented here, there is a presumption of negligence on the part of Miller and its employees, casting upon it the burden to establish its freedom from fault. It is the depositary's obligation, which is rigorously enforced when a fee is charged for its service, to restore the deposits to their respective owners in the state in which they were received, subject to such deterioration not effected by the act of the depositary.
For instance, in Douglas v. Haro, 214 La. 1099, 39 So.2d 744 (1949), the court pointed out:
"Under the provisions of our Civil Code, a deposit is defined as an act by which a person receives the property of another, binding himself to preserve it and return it in kind. The depositary must use the same diligence in preserving the deposit as he does in preserving his own property and the deposit must be restored on demand in the state in which it is in at the moment of restitution subject *493 to deteriorations not affected by an act of the depositary. Articles 2926, 2937, 2945, 2955, Revised Civil Code." 39 So.2d 744, 745.
The evidentiary rules relating to the burden of proof, care, et cetera, which must be borne by the depositary is analogized to the doctrine of res ipsa loquitur. For instance, it was declared by this court in Jeter v. Lachle, supra:
"This situation is analogous to a situation where the doctrine of res ipsa loquitur is applicable. In instances such as this, where the relationship of bailor and bailee has been established and damage or injury has been shown to the property constituting the deposit, the burden is upon the bailee or depositary to exonerate himself from the presumption of negligence or fault." 106 So.2d 808, 810.
See, also: Johnson v. Supreme Truck & Trailer Service, 119 So.2d 660 (La.App., 2d Cir. 1960); Leigh v. Johnson-Evans Motors, Inc., supra.
The conclusion is inescapable that plaintiff, Miller, has not overcome the burden the law imposes upon him and established by a preponderance of evidence its freedom from fault. The testimony of Miller's president and manager, moreover, supports this conclusion. He stated that when the brushes in the cleaning process are permitted to be lowered to the bottom of the truck bed, the swirling of the brushes causes them to pick up objects and throw them out against other vehicles and into the employees working in the vicinity. From the presumptions under the doctrine of res ipsa loquitur, it appears reasonable to conclude that some part of the brushes or metal parts to which they are attached became entangled with the hose, and that the force and tension created by the forward progress of the truck in the washing process placed such a strain on the hose and nipple as to break them and tear them from their connections.
With respect to charges of negligence directed to defendant Crowe, the proof that the liquid withdrawal or discharge valve was in an open position at the time of the explosion and fire is uncontradicted. As heretofore observed, if this valve had not been in an open position, there could have been no escape of gas notwithstanding the absence of an excess-flow valve. Nor would there have been an escape of gas though the hose was broken and the discharge valve was open, had the tank been properly equipped with an excess-flow valve. It is undisputed that the rules and regulations of the Louisiana Liquefied Petroleum Gas Commission require as a safety measure that the withdrawal or discharge valve be closed at all times except when in use. Therefore, Crowe's failure, or that of his employees, to close the value was in direct violation of the rules and regulations of the Commission and, as such, constituted negligence per se. Unquestionably, the open position of this valve, which permitted the escape of gas, was a direct factor in the occurrence of the explosion and fire. In the absence of any regulations by the Commission, the act of leaving the valve open would be a gross deviation from the standard of care of a reasonable and prudent person using liquefied petroleum products.
In Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962), an action for damages, plaintiff relied primarily upon complaints of negligence against the driver of an obstructing RC Cola truck. These complaints were: (1) stopping and parking the truck upon the main-traveled portion of a highway and leaving less than 15 feet of the highway unobstructed in violation of LSA-R.S. 32:241, and (2) failing to display signal flags or other warning devices on the highway at a distance of 100 feet behind and in front of the truck to protect approaching traffic as required by LSA-R.S. 32:442. With these violations in mind, the court declared:
"The statute was designed to protect life and property on the highways. It is a safety measure. The violation of *494 its provisions is negligence per se, and this negligence is actionable if it was a legal cause of the collision.
* * * * * *
"Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm." 137 So.2d 298, 302.
The court held that defendant's negligent conduct in violating the aforesaid provisions of the statute was a substantial factor in bringing about the collision which would not have occurred without it.
As pointed out in Maggiore v. Laundry & Dry Cleaning Service, 150 So. 394, 396 (La.App., Orl.1933):
"A violation of a statute enacted for the safety of life or limb necessarily has the relationship of cause to effect where the final effect is such as could not have occurred had the statute not been violated."
The rule is stated somewhat differently in 38 Am.Jur., "Negligence," Sec. 167, p. 841:
"The general principle is that the violation of a statute or ordinance is not rendered remote as the cause of an injury by the intervention of another agency if the occurrence of the accident, in the manner in which it happened, was the very thing which the statute or ordinance was intended to prevent."
As was declared in Butts v. Ward, 227 Wis. 387, 279 N.W. 6, 116 A.L.R. 1441:
"* * * Whenever the Legislature enacts a safety statute, it declares that injury from violation of it is reasonably to be anticipated. The Legislature establishes the standard of care to be exercised and liability for injury resulting from violation of the standard follows."
These general principles were recognized in Home Gas & Fuel Co. v. Mississippi Tank Co., 246 La. 625, 166 So.2d 252, 255 (1964), which was an action by a purchaser of a propane-butane tank against a seller thereof for damages caused by a fire resulting from the accidental discharge of gas from a tank. There, we find these appropriate observations:
"The dangerous nature and hazardous character of liquefied petroleum gases has been recognized by the constitution and laws of this State and provision has been made for the regulation of its use in the interest of `public safety'. LSA-Const.1921, art. 6, § 28; LSA-R.S. 40:1841 et seq.
"Moreover, the jurisprudence of this State has recognized the greater and higher than ordinary degree of care demanded of those involved in the manufacture, preparation and distribution of propane-butane gas and similar products. Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963); Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627 (1953); Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441 (1946); Jones v. Blossman, 209 La. 530, 25 So.2d 85 (1946).
"The Rules and Regulations of the Louisiana Liquefied Petroleum Gas Commission published in accordance with Acts 63 and 563 of 1950 require that `connections to containers * * * shall be provided with suitable automatic excess flow valves', and these valves are required by those regulations to be tested and listed by Underwriters' Laboratories, Inc., or approved by the Director of the L. P. Gas Commission. Neither of these requirements was met by the Mississippi Tank Company.

"The regulation requiring the installation of an excess flow valve is sanctioned by law. It is a regulation designed to protect the public safety. The violation of its provisions is negligence per se, and this negligence is actionable if it was a legal cause of the fire and the damages which ensued. Dixie Drive It Yourself Sys. v. American Beverage *495 Co., 242 La. 471, 137 So.2d 298 (1962).
"To be actionable the cause need not be the sole cause, but it must be a cause in fact, and to be a cause in fact it must have a proximate relation to the harm which occurs and it must be substantial in character.
"Undoubtedly Mississippi Tank Company's failure to install the excess flow valve as required by law was a substantial factor in the cause of the fire and destruction. The effect of this negligent omission continued to the very moment of the act complained ofin the uncontrolled release of the gas, the resulting fire and destruction. But for the serious omission of a `suitable' excess flow valve on the part of Mississippi Tank Company, the damage would not have occurred, for a `suitable' valve as required by the regulations would have functioned and provided the intended protection." (Emphasis supplied.)
What was therein said with respect to negligence in the failure to install an excess-flow valve as required by the rules and regulations of the Louisiana Liquefied Petroleum Gas Commission has equal application in the instant case not only to the fault of the one whose duty it was to install the excess-flow valve but to Crowe, who permitted a withdrawal or discharge valve on the tank on his truck to remain open when it was not being used. Crowe's act in leaving this valve open in violation of the regulations was an efficient cause of the gas leakage, the subsequent explosion, and the fire. Leakage of gas and the consequences flowing therefrom are the risks intended to be avoided through observance of the regulations. It is unreasonable to say that Crowe should not have anticipated that which actually happened or something of a similar nature. In matters like this the criterion governing liability is whether the person creating the danger could or should reasonably have foreseen that the accident might occur. If such was the case, then he is liable notwithstanding an intervening cause. 38 Am.Jur., "Negligence," Sec. 70, pp. 726, 727; Jackson v. Jones, 224 La. 403, 69 So. 2d 729, 733 (1953).
Miller's negligence, as well as that of Crowe, clearly comes within the generally accepted definition of "proximate cause," which has been stated as follows:
"A comprehensive definition, and one which is, perhaps, most often stated, is that proximate cause is any cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred, and from which it ought to have been foreseen or reasonably anticipated by a person of ordinary prudence in the exercise of ordinary care that the injury complained of, or some similar injury, would result therefrom as a natural and probable consequence.
"More concisely, `proximate cause' has variously been defined as: That which immediately precedes and produces the effect, as distinguished from a remote, mediate, or predisposing cause; that from which the fact might be expected to follow without the concurrence of any unusual circumstance; that without which the accident would not have happened, and from which the injury or a like injury might reasonably have been anticipated; and the last negligent act contributing to the injury, and without which the injury would not have occurred." 65 C.J.S. Negligence § 103, pp. 1128-1131.
However, the negligence of one person need not be the sole cause of an injury. It is sufficient that such negligence was one of the efficient causes of the injury without which the injury would not have resulted. We had occasion in Wilson v. Scurlock Oil Company, 126 So. 2d 429, 436 (La.App., 2d Cir. 1960cert. denied), to observe:
"There may be more than one proximate cause of an accident or injury and, *496 where each of the concurrent efficient causes contributes directly to the accident or injury, each of said acts constitutes a proximate cause thereof. Thus, as a general rule, negligence, in order to render a person liable, need not be the sole cause of an accident or injury. It is sufficient that negligence concurring with one or more other efficient causes combine to produce the damage or injury. Concurrent causes are causes acting together to produce an injury which would not have resulted in the absence of either. Concurrent acts of negligence which may impose liability on two parties acting separately need not necessarily occur simultaneously if they are so related to directly contribute to the accident."
In stating the rule, we find this language used in 65 C.J.S. Negligence § 110, pp. 1179-1183:
"It is generally considered that there may be more than one proximate cause of an accident or injury, that each of the concurrent efficient causes contributing directly to the accident or injury is a proximate cause thereof, and that the existence of one proximate cause of an accident or injury does not excuse another proximate cause. * * * In any event, two or more separate and distinct acts of negligence operating concurrently may constitute the proximate cause of an injury. * * * It is sufficient that his negligence, concurring with one or more efficient causes, other than plaintiff's fault, is the proximate cause of the injury."
It was similarly noted in Dixie Drive It Yourself Sys. v. American Beverage Co., supra:
"It is clear that more than one legally responsible cause can, and frequently does, contribute to a vehicular collision." 137 So.2d 298, 302.
See, also, Edelman v. Refrigeration Equipment Co., 72 So.2d 627 (La.App., 1st Cir. 1954writ denied), in which it was held that, where carbon monoxide gas was created in an equipment room of a combined heating and cooling system as the result of a solid door which prevented entry of combustion air into the equipment room, and the carbon monoxide gas was blown through an open duct into sleeping quarters causing injuries to its occupants, the negligence of the installer in approving the operation of the system without warning the owner of the danger of a solid door and the negligence of another causing a break in the duct was each a concurring and proximate cause, and the installer was liable for damages.
Both Miller and Crowe were guilty of efficient, concurring negligence in the occurrence of the accident. Hence, neither they nor those dependent upon a finding of their freedom from fault may recover.
The views herein expressed render unnecessary a discussion of Crowe's alleged failure to properly instruct or warn Miller's employees of the danger inherent in working with or in the vicinity of butane or propane gas. Miller could derive no benefit or comfort from the sustaining of its contentions in that respect.
Nor do we find any basis for disagreement with the conclusion reached by the trial court that negligence was not established on the part of Bancroft. His testimony that he properly installed the valves and hoses was uncontradicted. Where the vehicle and butane tank had been in possession of Crowe and used by his employees for two months, the circumstantial evidence offered was insufficient to overcome Bancroft's positive assertion.
We find no errors in the judgment appealed and it is accordingly affirmed at plaintiff-appellant's costs.
Affirmed.